61 So.2d 83

**CLABURN v. MATHEWS et al.**

**7 Div. 161.**

Supreme Court of Alabama.

Oct. 23, 1952.

42

Wilkinson & Skinner, Birmingham, and Dempsey & Hardegree, Ashland, for appellees.

A. L. Crumpton, Ashland, for appellant.

STAKELY, Justice.

This is a will contest. Mrs. Cora Lee Willoughby Claburn (appellant) filed a petition in the Probate Court of Clay County to probate the alleged last will and testament of William A. Willoughby. Mrs. Ella Willoughby Mathews and Mrs. Lula Willoughby Clark (appellees) filed a contest on the grounds that the alleged will was not duly executed by decedent, that decedent was of unsound mind and did not possess testamentary capacity at the time the will was executed and that the will was a product of undue influence exerted upon William A. Willoughby by Mrs. Cora Willoughby Claburn.

On motion of contestants and their demand for a jury trial the cause was transferred to the Circuit Court of Clay County. Trial of the cause resulted in a verdict and judgment in favor of the contestants. The court overruled a motion for a new trial. Hence this appeal.

William A. Willoughby, an old soldier about 68 years of age, died in the Veterans' Hospital at Montgomery, Alabama, December 15, 1950. He was survived by four sisters who were his sole heirs at law,—Mrs. Cora Claburn, Mrs. Fannie Diel, Mrs. Lula Clark and Mrs. Ella Mathews. Several years prior to the time the document offered for probate is alleged to have been executed, William A. Willoughby executed a will in which he left his estate to his four sisters share and share alike. The will offered for probate in the present proceedings leaves all his property to two of his sisters, Mrs. Cora Willoughby Claburn and Mrs. Fannie Willoughby Diel. This instrument nominates and appoints Cora Willoughby Claburn as Executrix without bond and in the event she fails to survive or is unable to serve nominates Mrs. Fannie Willoughby Diel as Executrix. The two sisters omitted from the alleged will offered for probate, Mrs. Lula Clark and Mrs. Ella Mathews, are the contestants.

I. The contention is made that the court was in error in refusing to give Charge A requested by the proponents of the will as follows, "The court charges the jury that if you believe the evidence in this case you must find in favor of the will." In passing upon the question we shall consider the tendencies of the evidence against the will. Slagle v. Halsey, 245 Ala. 198, 15 So.2d 740.

William A. Willoughby was admitted to the Veterans' Hospital in Montgomery, Alabama, on October 13, 1950. The alleged will was dated October 31, 1950. William A. Willoughby died December 15, 1950. At the time of his death the decedent was 68 years of age. The hospital record shows that at the time of his admission he appeared to have a senile obsession in his concern about his constipation. In December 1939 he had a stroke. In December 1940 he became paralyzed on his right side. In 1942 he was paralyzed on his left side. Since 1942 he had been relatively inactive complaining of anginal pain. When he was admitted to the hospital he appeared to be laboring under the delusion of a stomach ulcer and constipation. In January or February 1949 he had severe anginal pains, probably coronary occlusion, which required oxygen therapy and a period of hospitalization. Following this he had more frequent anginal attacks and he would take as many as a dozen tablets daily of nitroglycerin. At that time his only noted injury appeared to be a shrapnel wound on his left lower leg, leaving it slightly deformed, painful and with somewhat poor circulation. His medical record shows that he continued to complain about his bowel habits, although there appeared to be no

true constipation. He showed evidences of mental deterioration, oftentimes being querulous. He began to complain of pain in his right leg. On October 28, 1950 gangrene developed in his right leg, three days before the alleged will was executed. On December 5, 1950 his right leg was amputated. Pneumonia set in and he died December 15, 1950.

Dr. Marsh testified that stoppage of circulation caused the gangrene. He also testified that from the time Mr. Willoughby entered the hospital until November 5, 1950, he observed defects in his memory. He would oftentimes fail to remember that the doctor had seen him in the morning. According to the witness lapses of memory of this kind are apt to occur with those who suffer this amount of pain. He further testified that high blood pressure such as William A. Willoughby had, accompanied by strokes, frequently resulted in lapse of memory and inability to use arms and muscles of one side indicated brain damage. Further, bodily disease can also cause a disease of the brain. In other words, the state of the body can affect the state of the mind or brain. According to him some of the involvements which William A. Willoughby had were of a permanent character. He further testified that brain disease may result in the inability of the victim to withstand requests made of him or of being unable to do what a normal person would do under the circumstances. Brain disease has a tendency to destroy normal inhibitions. Furthermore a patient may be insane from a psychiatric standpoint and yet appear normal to a layman or even physicians who are not psychiatrists. According to him the medical record indicates that he was depressive and apprehensive at intervals. He was frequently given narcotics for his pain and the man who receives narcotics frequently will not be in full possession of his faculties. He was restless and had a poor appetite and lost weight while in the hospital. According to him a man in bad physical condition and in a state of anxiety about his physical condition frequently reaches a point where he regards it futile to make demands on his will power. Heart trouble such as William A. Willoughby had implicates the brain or nervous system. Heart trouble or high blood-pressure, or both, might be the starting point for a psychiatric disorder. After his death Mrs. Cora Claburn consented for an autopsy on her brother but did not grant permission for opening his head.

Mrs. L. E. DeShazo, a niece of the deceased, testified that she visited deceased in the Veterans' Hospital frequently, practically every day beginning two or three days after he was admitted and that he would talk about his war days and ask visitors if we "Didn't hear mortars firing and guns firing outside—and he got right angry with us at times when we told him we didn't hear anything." She further testified:

"One night, just a few days after his heart attack, he asked us if we heard the commotion that took place the night before We told him no and he said that this Joe Hawkins was standing at the corner of the building with a microphone and spotlight telling people to be on the lookout for William A. Willoughby, he was trying to escape from the hospital, and we asked him if it wasn't a nightmare and he said, no, he looked out the window and saw him standing by the corner of the building. He told me that two or three times after that."

Mr. L. E. DeShazo gave similar testimony and both testified that in their opinion Mr. Willoughby was not of sound mind while he was in the hospital and that his mind was not sufficiently strong to enable him to attend to ordinary business matters.

H. L. Jackson, Rev. B. W. Mathews, J. E. Mathews, T. O. Mathews and Mrs. Lula Clark testified to facts and circumstances showing that William A. Willoughby was not of sound mind at times and some of them testified that he was not of sound mind while he was in the hospital.

No explanation appears as to why William A. Willoughby developed a change of purpose after he had developed a gangrene condition to leave all of his property to two of his sisters, where before he had left his property to his four sisters, share and share alike.

Mrs. Cora Claburn was a witness in the case and the jury had the opportunity of observing her demeanor on the witness stand. There is testimony that she looked after William A. Willoughby's affairs in Birmingham and while he was in the hospital. She paid her attorney for drafting the alleged will like she instructed him to draft it and there is no claim by her that she was reimbursed for that expense. She was, of course, a favored beneficiary in the will and she did not disclose its existence to Mrs. Clark or Mrs. Mathews until after William A. Willoughby was buried. She left the hospital on Sunday, October 29th, came to Birmingham, saw her lawyer the first thing Monday morning and was back at Montgomery by 11:00 o'clock Tuesday with the will which was signed right away. She testified that William A. Willoughby had a great deal of confidence in her and leaned on her a good deal.

She was asked the following question to which she gave the following reply: "Q. And you put the will in your purse and came down to Montgomery and had it signed and brought it back and kept it until the man died? A. That's right." Mrs. Claburn testified that "she got the nurse" as a witness to the will and the nurse went out and got Dr. Zdaris as a witness. Dr. Zdaris testified when asked if Mr. Willoughby requested him to sign the will as a witness that "Actually this lady (Mrs. Claburn) requested it." He further testified that Mrs. Claburn presented the will to the sick man for his signature and "told him to sign here" and he then signed the will.

The court committed no error in refusing Charge A requested by the proponent of the will. There was evidence from which the jury had the right to infer that the defendant did not have the mental capacity at the time the will was executed to make a will. It is true that there was no medical testimony to this effect, but there was testimony of qualified lay witnesses tending to show that the decedent did not have mental capacity at the time the will was executed to make a will. Such testimony is competent and admissible. George v. State, 240 Ala. 632, 200 So. 602; Parrish v. State, 139 Ala. 16, 36 So. 1012; Towles v. Pettus, 244 Ala. 192, 12 So.2d 357.

Furthermore on the issue of undue influence in the procurement of the will, the case was a case for the jury. There was evidence tending to show a confidential relationship existing between William A. Willoughby and his sister Mrs. Cora Claburn. There was testimony tending to show activity on the part of the latter in and about the preparation and execution of the will. There was testimony tending to show that William A. Willoughby was an old and infirm man and his memory and other mental faculties were failing. There is no doubt that his weakened physical condition due to a series of strokes and a gangrenous condition in his leg which required an operation, affected him so as to weaken his will to resist. This evidence all taken together made a case for the jury. Zeigler v. Coffin, 219 Ala. 586, 123 So. 22, 63 A.L.R. 942; Posey v. Donaldson, 189 Ala. 366, 66 So. 662; Shelton v. Gordon, 252 Ala. 187, 40 So.2d 95.

II. Furthermore upon a careful consideration of the record we think there was ample evidence which, if believed, justified the verdict of the jury in finding for the contestants and against the will. We cannot affirm that the preponderance of the evidence is so decided as to convince us clearly that the verdict was wrong and unjust. Accordingly there was no error in refusing the motion for a new trial. King v. Aird, 251 Ala. 613, 38 So.2d 883.

III. What we have said is sufficient to show that there was no error in giving Charge 1 requested in writing by the contestants. Zeigler v. Coffin, supra; Posey v. Donaldson, supra; Shelton v. Gordon, supra; Bancroft v. Otis, 91 Ala. 279, 8 So. 286.

IV. There was no error in giving Charge 2 requested in writing by the contestants. It is argued that the charge disregards the fact that there was no evidence showing or tending to show any influence used by Mrs. Claburn, due or undue, in procuring the execution of the will. This con-

tention is not justified as we have shown. Authorities supra.

■ V. There was no error in giving written Charge 3 requested in writing by the contestants. This charge is criticized in that it authorizes a finding of insanity in the absence of any proof from which such a finding can be made. What we have said disposes of this contention. Authorities supra.

■ VI. There was no reversible error in giving written Charges 4 and 5. Bancroft v. Otis, supra.

■ VII. There was no reversible error in giving written Charge 6 requested in writing by the contestants. If it failed to define undue influence, this could have been cured by a request for an explanatory charge. Besides undue influence was defined in the oral charge.

■ VIII. There was no reversible error in giving written Charge 13 requested in writing by the contestants. Lewis v. Martin, 210 Ala. 401, 98 So. 635; Smith v. Smith, 174 Ala. 205, 56 So. 949; Coghill v. Kennedy, 119 Ala. 641, 24 So. 459.

■ IX. There was no reversible error in giving written Charge 14 requested in writing by the contestants. Coghill v. Kennedy, supra; Smith v. Smith, supra.

■ X. There was no error in giving the unnumbered charge requested in writing by the contestants. We have designated this Charge "X" for convenience. A jury should not be required to find for the will when they are not reasonably satisfied from the evidence that the alleged testator knew and understood the contents of the document. Unless he knew and understood the contents of the document, it was not a valid will no matter if he may have signed it. McCartney's Ex'rs v. Bone, 33 Ala. 601.

We consider that the case is due to be affirmed.

Affirmed.

LIVINGSTON, C. J., and BROWN and LAWSON, JJ., concur.